UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANGIE THOMPSON, )<br>)<br>    Plaintiff, )<br>) | |
| ) | 1:04-CV-0112-JDT-TAB |
|     vs. )<br>)<br>BALKAMP, )<br>)<br>    Defendant. )<br>) | |

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**[1]

Plaintiff, Angie Thompson, is a former employee of Defendant, Balkamp. Thompson claims Balkamp acted in disregard of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). Specifically, she alleges that Balkamp, a company engaged in the business of distributing automotive parts and supplies, violated the FMLA by terminating her employment due to her utilization of intermittent FMLA leave. Balkamp denies violating the FMLA and moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

    **I.**     **Factual Background**

On May 10, 1999, Thompson began her employment with Balkamp as a part-time packaging clerk at Balkamp's Indianapolis facility, which was later relocated to

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

Plainfield. On September 20, 1999, Thompson was offered and accepted a full-time packaging clerk position with Balkamp. Thompson subsequently bid for and was awarded promotions to higher paying positions, including order puller and stock handler positions. Thompson also received a number of wage increases during her employment tenure.

While at Balkamp, Thompson read and was required to abide by various company policies and procedures, including Balkamp's Statement of Understanding Regarding Honesty and its handbook entitled *Balkamp's Benefits, Guidelines and Procedures* ("Employee Handbook"). The Employee Handbook details, among other things, examples of prohibited conduct which will subject employees to disciplinary actions, up to and including immediate termination. Examples of prohibited conduct provided by the Employee Handbook include "dishonest, illegal or indecent conduct," "falsifying any Company record or report," and "working for or on behalf of a competing employer or engaging in any other employment or activities which conflicts with the Company's interest."

Thompson also received a copy of the Company's Book of Benefits, which details various benefits for which Thompson was eligible to apply, including FMLA leave and Short-Term Disability ("STD") benefits. The Company's FMLA leave policy provides that employees who have worked for the company at least twelve months and who have worked at least 1250 hours in the immediately proceeding twelve months are eligible for up to twelve weeks of unpaid FMLA leave within a twelve month rolling period of time. Balkamp's STD plan is a Company-sponsored benefit program that provides eligible

employees with a portion of their wages during periods when a temporary medical condition renders the employee unable to work.  Certain qualifications for coverage under the STD program must be met and company policy provides that claims for STD benefits are "subject to investigation and fraudulent representations will subject the employee to disciplinary action up to and including discharge."  The policy further provides that STD benefits run concurrently with an employee's FMLA leave.

Thompson has asthma, which sometimes limits her ability to work.  During her employment with Balkamp, Thompson requested leave from work pursuant to the FMLA on a number of occasions based on her asthma and other medical conditions.  On each occasion, Balkamp granted Thompson leave and, upon the conclusion of her leave, returned her to her position with the same duties, hours, wages and benefits.  Balkamp also provided Thompson with STD benefits in connection with many of her various leaves from work.

Thompson first requested FMLA leave for the period of November 1, 1999, through November 19, 1999.  At the time of her request, Thompson had been employed with Balkamp for less than one year and thus was ineligible for FMLA leave.  Nonetheless, the Company granted Thompson leave from work.  Thompson again requested leave from work, for apparent medical reasons, from December 3, 1999, through December 10, 1999.  Balkamp granted Thompson leave from work pursuant to her request and provided her with STD benefits during her leave.  On January 3, 2000, Thompson requested additional leave for medical reasons, and did not return to work until March 10, 2000.  During this time, on February 2, 2000, Randy Ison, Human

Resources Manager, communicated to Thompson that a note provided by Thompson's doctor released her to return to work on January 25, 2000, and requested that Thompson provide updated information confirming the reason for her continued absence. Despite her absence without appropriate documentation, Balkamp continued to grant Thompson leave pursuant to her request and provided her with STD benefits. Ison also relayed to Thompson that Balkamp employees reported having witnessed Thompson participating in Bingo games at a local lodge during her medical leave, which would be a violation of company policy.

Thompson also requested leave from work from October 19, 2000, through November 1, 2000. Balkamp granted Thompson FMLA leave and provided her with STD benefits. Thompson returned to work with certain temporary light duty work limitations and Balkamp accommodated such limitations. On November 29, 2000, Thompson's health care provider released her to return to work on a full-duty basis, whereupon Balkamp returned Thompson to her former position.

Thompson again requested FMLA leave for the period of April 13, 2001, through May 2, 2001. Balkamp granted Thompson leave from work pursuant to her request and provided her with STD benefits during her leave. Thompson next sought FMLA leave commencing on June 26, 2001, and did not return to work until August 9, 2001. On July 24, 2001 Balkamp sent Thompson a letter notifying her that she had exhausted all available FMLA leave on July 20, 2001. Nevertheless, Balkamp held Thompson's position available for her during the duration of her leave and provided Thompson with STD benefits. On August 9, 2001, Thompson returned to work with certain lifting

limitations, which Balkamp accommodated.

Once more, Thompson requested FMLA leave from work from January 11, 2002, through January 17, 2002. Balkamp granted Thompson's request for leave from work, held Thompson's position available for her during her leave, and provided Thompson with STD benefits. Shortly after returning from this FMLA leave, Ison had a meeting with Thompson where he told her that her absences related to her asthma were excessive, and that whether or not she was at work, production had to go out. In addition to this meeting, Ison had other meetings with Thompson in 2002, prior to May, where he was critical of her continued absences. In 2002 Thompson bid for several other jobs within Balkamp. At one point when discussing Thompson's bid for other jobs, Ison informed Thompson that she had to be at work and have a good track record in order to qualify for the jobs.

Leave was again requested by Thompson from April 10, 2002, through April 16, 2002. Balkamp granted the request and provided her with STD benefits. In May 2002, Thompson requested FMLA leave from work commencing on May 13, 2002, again purportedly for medical reasons associated with asthma. Balkamp granted Thompson's request for leave from work. Thompson submitted documentation to Balkamp from her physician stating that "[t]he patient was, or will be able to return to work on May 28, 2002." She was granted leave from May 13, 2002, to May 28, 2002, and was provided with STD benefits during her leave.

In late May 2002, during Thompson's leave from work, a number of Thompson's

co-workers reported to Balkamp that they had witnessed Thompson working at bingo events at the Speedway Moose Lodge while Thompson was on leave from work in May of 2002, including on May 19, 2002.  Among other things, employees reported that during the month of May 2002, they observed Thompson working at bingo events in a smoky environment at the Moose Lodge, selling bingo and other game tickets and calling bingo games while she was on leave from work.  One employee reported that Thompson asked that employee not to tell anyone at Balkamp that Thompson was at the bingo event, and another employee reported having also seen Thompson at a bowling alley while Thompson was on leave from work.

Kevin Slemensek, Plant Manager, and Jerry Lents, Service Manager, along with Ison were made aware of the reports.  Ison and Slemensek determined that if the reports of Thompson's conduct were accurate, and the number of employees confirming the reports suggested that they were, she had violated Company policy.  Accordingly, they decided to discuss the reports with Thompson upon her return to work.

On May 28, 2002, upon Thompson's return to work, Ison and Slemensek met with Thompson about the reports from employees concerning her bingo participation. During the meeting, Thompson acknowledged that she had been to bingo events at the Moose Lodge during her leave from work and had helped out with running the games as a volunteer.  Ison and Slemensek inquired as to why Thompson would work at a smoky bingo hall in light of her asthma flair-up, which she said necessitated her leave from work in May 2002. Thompson responded that she had not really though about it. Slemensek questioned why it was necessary for Thompson to take time off for asthma,

when he has asthma and it does not prevent him from working.  As a result only of his previous attendance at other bingo parlors, Ison was convinced that Thompson was receiving compensation in the form of tips, despite her contention that she had not received such compensation and that tipping was not permitted at the Moose Lodge since it violated Indiana law.  No investigation was conducted into whether or not Thompson was, in fact, compensated in any manner for activities at the Lodge.

     Immediately following this conversation, Ison and Slemensek reported to Debbie Stickley, Balkamp's General Manager, concerning their conversation with Thompson and the reports from various employees regarding Thompson's activities while on leave from work and while collecting STD benefits, including that they had witnessed Thompson working at bingo activities.  On May 30, 2002, Stickley and Lents met with Thompson regarding her conduct while on leave and collecting STD benefits from the company.  During the meeting, Stickley informed Thompson that several employees had reportedly seen her calling bingo and selling tickets at the Moose Lodge when she was on leave from work.  Stickley decided that the issue of whether or not Thompson had been compensated for her services was irrelevant because her conduct in assisting with bingo events violated company policy.  Stickley also discussed that Thompson's representations regarding the limited time she purportedly spent at the bingo events were inconsistent with multiple employee reports that she had been seen at the bingo events for significantly longer periods of time.

At the conclusion of the meeting, Stickley informed Thompson that her employment with Balkamp was terminated because her conduct violated company policy. The policy Stickley referred to in discussing the situation with Thompson included the company's policy prohibiting employees from "[w]orking on behalf of a competing employer or engaging in other employment or activities which conflicts with the Company's interest." Following the meeting, Stickley prepared a written statement summarizing the matters discussed during her meeting with Thompson. On May 30, 2002, Balkamp completed a Notice of Separation form documenting that Thompson was terminated from her employment for "Violation of Company rules or policies" and further detailed that Thompson "was off on Short Term Disability and working a second job." The term "working" was used despite the lack of investigation into whether she actually received compensation for her Moose Lodge activities.

During the relevant time period, Balkamp has granted other employees leave from work pursuant to the FMLA and has not terminated their employment following their return to work from their respective leaves, including Stickley, Lents, and Thompson's husband, James Thompson. As with the many leaves provided to Thompson during her employment with Balkamp, these employees' requests for time off from work were granted, their positions were held for them, and upon the conclusion of their leaves, they were returned to their positions with the same duties, hours, wages and benefits.

The record shows that other employees who did not seek FMLA leave and/or STD benefits, but engaged in perceived misconduct, including dishonesty, have been

fired by Balkamp. In addition, Thompson herself has brought forth evidence that Balkamp fired another employee when it discovered that the employee was working a second job while on FMLA leave.

### II.     Summary Judgment Standard

Summary judgment is appropriate when the record shows that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" dispute about a material fact exists if the evidence is such that a reasonable jury could return the verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *Id.* at 255.

On a motion for summary judgment, the moving party bears the initial responsibility of coming forward and identifying those portions of the record which it believes demonstrates the absence of any genuine issue of material fact. *Celotex. Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where the moving party meets its initial burden of supporting the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of an alleged factual dispute between the parties or the existence of "some metaphysical doubt as to the material facts" is not sufficient to defeat a well supported

motion for summary judgment.  *Van Diest Supply Co. V. Shelby County State* Bank, 425 F.3d 437, 439 (7th Cir. 2005)(internal citations omitted).

### III. Analysis

Thompson claims that Balkamp took retaliatory measures in terminating her employment after her use of FMLA leave.  In a case where an employee is pursuing a claim of retaliation based upon the FMLA, "the issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Horwitz v. Board of Educ. of Avoca School Dist. No. 37*, 260 F.3d 602, 616 (7th Cir. 2001)(citing *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)).  In this regard, a plaintiff alleging FMLA retaliation must establish that the defendant engaged in intentional discrimination.  *Id.*  An employee may establish FMLA retaliation pursuant to either the direct or indirect methods of proof so often discussed in decisions where a plaintiff claims some type of employment discrimination.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 509 (7th Cir. 2004).

A plaintiff using the direct method of proving retaliation "must show either through direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose ... ."  *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-39 (7th Cir. 2003).  Direct evidence of discrimination is tantamount to an admission of the proscribed motive and rarely encountered.  *Venturelli v. ARC Community Services, Inc.,* 350 F.3d 592, 599 (7th Cir. 2003).  Circumstantial evidence of intentional discrimination may include "ambiguous statements, suspicious

timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Adams*, 324 F.3d at 939 (citing *Troupe v. May Dept. Stores Co*, 20 F.3d 734, 737 (7th Cir. 1994)). However, that circumstantial evidence "must point directly to a discriminatory reason for the employer's action. *Id*.

Here, Thompson admits there is no direct evidence of retaliation, but instead claims to have circumstantial evidence sufficient to directly prove retaliation. She believes the following circumstantial evidence creates a "mosaic" of intentional discrimination: (1) Ison's questioning of Thompson prior to her May 2002, FMLA leave and his expression of concern regarding the large number of absences she had been accruing; (2) the refusal of Balkamp to consider Thompson for a different position due to absences; (3) the interrogation by Ison and Slemensek upon Thompson's return from FMLA leave in May 2002; (4) Ison's allegedly self created evidence to support her termination; and, (5) the termination occurring three days after she returned from FMLA leave.

Thompson's mosaic of evidence is hardly overwhelming, but it is sufficient to survive a motion for summary judgment. The court finds the statements and involvement of Ison and Slemensek the most concerning. They connote, at a minimum, a preoccupation with Thompson's use of FMLA leave. Balkamp maintains that Stickley was the person ultimately responsible for Thompson's termination and therefore the comments or actions of those not involved in the decision making process do not constitute evidence that the termination was discriminatory. *See Gorence v. Eagle*

*Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).  It argues that a non-decision maker's actions are only relevant if there is other evidence from which a reasonable jury could infer that their animus influenced the ultimate decision maker so greatly as to have caused the termination.  *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1066 (7th Cir. 2003).

Ison and Slemensek's actions are relevant here because those actions, in combination with other evidence, could lead a fact-finder to a conclusion that the termination decision was as much theirs as it was Stickley's.  Ison insisted, without knowing, that Thompson had received pay of some sort and had questioned Thompson's use of FMLA leave in the past.  He also solicited other employees for information regarding Thompson's activities outside of work and pointed to her continued absences while on leave as a reason why she was unlikely to obtain any promotion.  Slemensek's attempts to compare his medical condition to Thompson's suggests that he also may have approached the investigation of her activities with less than an open mind.  It is also peculiar that the stated company policy violation was that Thompson was "working" a second job when the company could only speculate that she was compensated for her activities, while ignoring Thompson's statements refuting Ison's conjecture.

Ison and Slemensek were charged with investigatory responsibilities and the results of their investigation into Thompson's activities were shared directly with the "ultimate" decision maker.  While Stickley may not have personally held any discriminatory or retaliatory animus, "[A] decision-maker cannot be the 'conduit' of

another's prejudice. *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1100 (7th Cir. 2001). Commonly known as a "cat's paw" theory, Thompson has offered just enough evidence to allow the case to move forward under a theory that Ison and Slemensek provided the influence that resulted in her termination and their investigatory actions were undertaken with retaliation in mind. Whether Ison, as a human resources manager, was looking into the circumstances of Thompson's absences as a part of his work routine or because he thought she used too much FMLA leave is, at this point, still a question of fact that prevents the court from finding that no reasonable jury could decide the case in favor of Thompson.

Thompson's mosaic also includes the circumstantial evidence of the timing of her termination, only a few days after her return from leave. Suspicious timing on its own is insufficient circumstantial evidence to establish FMLA retaliation under the direct method. *Buie v. Quad/Graphics. Inc.*, 366 F.3d 496, 509 (7th Cir. 2004). However, here Thompson has presented some additional evidence that causes the court to find that there is more than a metaphysical doubt with respect to some material facts and a jury should be allowed to hear all the evidence and reach its own conclusion.

Since the court has determined that Thompson has developed a sufficient mosaic of evidence to allow her to move forward with her case under the direct method of proof, there is no need to analyze the elements of a prima facie case under the *McDonnell Douglas* burden shifting template. However, the parties do not agree on whether Thompson's leave from work during May 2002, was a statutorily protected activity. A prerequisite to any retaliation claim is that the retaliation be for plaintiff

engaging in some type of protected activity.  *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-568 (3rd Cir. 2002).  The FMLA forbids an employer from taking action against those who exercise their rights under the Act.  29 U.S.C. § 2615.  So, to the extent that the parties disagree as to whether Thompson was exercising her FMLA leave rights, it is her burden to establish the same.

In large part, this disagreement arises from the method of calculating available FMLA protected leave days.  Balkamp contends that it employed a "rolling calendar" method for measuring FMLA days available to an employee.  If that method is utilized here, Thompson had exhausted her available FMLA days long prior to her return from leave in May of 2002.  Accordingly, Balkamp maintains that Thompson was not engaged in the protected activity of taking FMLA leave.

Thompson argues that Balkamp had altered its method of computing leave availability and that the regulations allow for such a change in calculation methods only if the employees are not adversely affected during the course of the changeover.  The court finds it difficult to follow the evidentiary analysis proffered by Thompson in  support of her contention that there had been a change in computation methodology.  While it appears that the employee handbook does contain general language that might be construed as implying that a "forward looking" method of calculation would be used in calculating the twelve weeks of FMLA leave available in a twelve month period, the Human Resources Manual is quite specific as to how the "rolling year" method is utilized.  Balkamp insists that such a method of calculation was applicable at all times.  However, the record is not clear enough on this point for the court to feel comfortable

making a decision as to what method was actually applicable. Further, it seems clear that Thompson's claim of retaliation is not just limited to retaliation for the period of time in May of 2002 when she was on leave, but should be considered as a claim of retaliation for any number of the considerable times she employed the Act's protections.

### IV. Conclusion

While the trier of fact may draw its own conclusions from the evidence that would not be favorable to Thompson's claim of FMLA retaliation, she has come forward with sufficient circumstantial evidence to create questions of material fact over which reasonable minds might differ. Accordingly, Balkamp's Motion for Summary Judgment is DENIED.

ALL OF WHICH IS ORDERED this 19th day of April 2006.

_____
John Daniel Tinder, Judge
United States District Court

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
eeboshko@bakerd.com

Kelley Bertoux Creveling
BAKER & DANIELS
kbcrevel@bakerd.com

Patricia Elizabeth Simon
MARTENSON HASBROUCK & SIMON LLP
pesimon@martensonlaw.com

Lisa Marie Szafranic
MARTENSON, HASBROUCH & SIMON LLP
lmszafranic@martensonlaw.com

Russell Alan Van Til
ABRAMS & WELDY
vantil@abramsweldy.com

Ronald E. Weldy
ABRAMS & WELDY
weldy@abramsweldy.com